1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   JEANETTE NEGRETE, individually,          Case No.  2:12-cv-02674-MCE-EFB
     and on behalf of other members of the
12   general public similarly situated, and as
     an aggrieved employee pursuant to the
13   Private Attorneys General Act            **MEMORANDUM AND ORDER**
     ("PAGA"),
14
                         Plaintiff,
15
             v.
16
     PETSMART, INC., a Delaware
17   corporation, RANDY MOSBACHER, an
     individual; and DOES 1 through 10,
18   inclusive,
19                       Defendants.

20

21

22          Plaintiff Jeanette Negrete ("Plaintiff") seeks damages from Defendants PetSmart,

23   Inc. and Randy Mosbacher (collectively, "Defendants") for violations of California state

24   law.  On September 20, 2012, Plaintiff filed a Class Action Complaint against Defendants

25   in the Superior Court of California, County of Shasta, on behalf or herself and others

26   similarly situated.

27   ///

28   ///

                                            1

1    On October 18, 2012, Plaintiff filed her First Amended Class Action Complaint, seeking

2    relief for: (1) unpaid overtime in violation of California Labor Code sections 510 and

3    1198; (2) unpaid minimum wages in violation of Labor Code sections 1194, 1197, and

4    1197.1; (3) wages not timely paid upon termination in violation of Labor Code sections

5    201 and 202; (4) unpaid meal period premiums in violation of Labor Code sections 226.7

6    and 512(a); (5) unpaid rest period premiums in violation of Labor Code section 226.7;

7    (6) non-compliant wage statements in violation of Labor Code section 226(a); (7) unpaid

8    business expenses in violation of Labor Code sections 2800 and 2802; (8) PAGA

9    violations of Labor Code sections 2698 through 2699.5; and (9) violations of California

10   Business & Professions Code sections 17200 through 17207.  Defendants removed the

11   case to this Court pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C.

12   § 1332(d).  (Notice of Removal by Defs., Oct. 29, 2012, ECF No. 1.)  Plaintiff moved to

13   remand the case to state court.  (Pl.'s Mot. to Remand, Nov. 26, 2012, ECF No. 5.)

14   Defendants filed a timely opposition to Plaintiff's motion.  (Defs.' Opp'n to Pl.'s Mot. for

15   Remand, Dec. 27, 2012, ECF No. 7.)  For the reasons set forth below, Plaintiff's Motion

16   to Remand is granted.[1]

17

18                                  **FACTUAL BACKGROUND**[2]

19

20        Plaintiff brings the present action on behalf of herself and other current and former

21   PetSmart groomers in California.  Plaintiff's proposed class includes groomers who

22   worked for Defendants within four years prior to the filing of this complaint until the date

23   of certification.  The estimated class contains 1,728 individuals.  (ECF No. 5 at 7; Pl.'s

24   Reply Mem. in Supp. of Mot. to Remand, Jan. 3, 2013, ECF No. 13 at 13.)

25   ///

26        [1] Because oral argument will not be of material assistance, the Court orders this matter submitted
     on the briefs.  E.D. Cal. Local Rule 230(g).

27

28        [2] The following recital of facts comes from Plaintiff's First Amended Class Action Complaint unless
     otherwise noted.  (ECF No. 1-3, Ex. D.)

1   Plaintiff worked as a pet groomer for Defendants at their Redding, California, location

2   from June 26, 2007, to August 11, 2012.

3          Defendant paid Plaintiff and her fellow groomers either an hourly wage or on

4   commission.  When Defendants did not pay Plaintiff an hourly wage of nine dollars, she

5   generally received about ten dollars an hour in commissions.  Plaintiff alleges that while

6   she worked for Defendants, she and putative class members did not receive pay for all

7   hours worked because Defendants did not record all hours worked.  Additionally, Plaintiff

8   alleges that even though Defendants knew or should have known she and putative class

9   members were entitled to overtime compensation, Plaintiff and putative class did not

10   receive overtime wages.  Plaintiff makes similar allegations with regard to minimum

11   wages for "off-the-clock" work; meal and rest period payments; and complete and

12   accurate wage statements.  Plaintiff also contends that Defendants improperly and

13   illegally reported time pay when Defendants required Plaintiff and putative class

14   members to report to work, but Plaintiff and putative class members worked for less than

15   half their regularly scheduled shifts.  Finally, Plaintiff alleges that Plaintiff and putative

16   class members did not receive full reimbursement for all business-related expenses and

17   costs that Plaintiff and putative class members incurred, nor did they receive vested

18   vacation wages earned upon termination, timely payment of wages earned upon

19   termination, or timely payment of wages during employment.  Plaintiff and putative class

20   members allege Defendants knew they owed Plaintiff and putative class members these

21   wages and payments, but Plaintiff and putative class never received those wages and

22   payments within permissible time periods.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

3

1

**LEGAL BACKGROUND**[3]

2

3       In September 2003, the California Legislature enacted the Labor Code Private

4   Attorneys General Act of 2004 ("PAGA").  Cal. Lab. Code §§ 2698-2699.5.  The

5   Legislature declared that adequate financing of labor law enforcement was necessary to

6   achieve maximum compliance with state labor laws.  Staffing levels for labor law

7   enforcement agencies had declined and were unlikely to keep pace with the future

8   growth of the labor market.  Therefore, it was in the public interest to allow aggrieved

9   employees, acting as private attorneys general, to recover civil penalties for violations of

10  the Labor Code, with the understanding that labor law enforcement agencies were to

11  retain primacy over private enforcement efforts.

12       Pursuant to PAGA, an "aggrieved employee" may bring a civil action personally

13  and on behalf of other current, or former, employees to recover civil penalties for

14  violations of the California Labor Code.  Cal. Lab. Code § 2699(a).  PAGA defines an

15  "aggrieved employee" as "any person who was employed by the alleged violator and

16  against whom one or more of the alleged violations was committed."  Id. § 2699(c).

17  Seventy-five percent of the civil penalties recovered go to the Labor and Workforce

18  Development Agency, leaving the remaining twenty-five percent for the "aggrieved

19  employees."  Id. § 2699(i).

20

21       **STANDARD**

22

23       There are two bases for federal subject matter jurisdiction:  (1) federal question

24  jurisdiction under 28 U.S.C. § 1331, and (2) diversity jurisdiction under 28 U.S.C. § 1332.

25  A district court has federal question jurisdiction in "all civil actions arising under the

26  Constitution, laws, or treaties of the United States."  Id. § 1331.

27  _____

28       [3] The following summary of the Private Attorneys General Act of 2004 comes from Arias v. Superior Court, 46 Cal.4th 969, 980-81 (2009).

4

A district court has diversity jurisdiction "where the matter in controversy exceeds the sum or value of $75,000, . . . and is between citizens of different states, or citizens of a State and citizens or subjects of a foreign state . . . ."  <u>Id.</u> § 1332(a)(1)-(2).  Diversity jurisdiction requires complete diversity of citizenship, with each plaintiff being a citizen of a different state from each defendant.  28 U.S.C. § 1332(a)(1); <u>Caterpillar, Inc. v. Lewis</u>, 519 U.S. 61, 68 (1996) (stating that complete diversity of citizenship is required).

When a party brings a case in state court in "which the district courts of the United States have original jurisdiction," the defendant may remove it to the federal court "embracing the place where such action is pending."  28 U.S.C. § 1441(a).  "The party invoking the removal statute bears the burden of establishing federal jurisdiction." <u>Ethridge v. Harbor House Rest.</u>, 861 F.2d 1389, 1393 (9th Cir. 1988) (citing <u>Williams v. Caterpillar Tractor Co.</u>, 786 F.2d 928, 940 (9th Cir. 1986)).  A motion to remand is the proper procedure for challenging removal.  "The party invoking the removal statute bears the burden of establishing federal jurisdiction."  <u>Ethridge</u>, 861 F.2d at 1393 (internal citations omitted).  Courts "strictly construe the removal statute against removal jurisdiction."  <u>Gaus v. Miles, Inc.</u>, 980 F.2d 564, 566 (9th Cir. 1992) (internal citations omitted).  "[I]f there is any doubt as to the right of removal in the first instance," the court must grant the motion for remand.  <u>Id.</u>  Additionally, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded" to state court.  28 U.S.C. § 1447(c).

**ANALYSIS**

The Class Action Fairness Act of 2005 ("CAFA") gives federal district courts original jurisdiction in any civil action where:  (1) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs," (2) the action is pled as a class action involving more than 100 putative class members, and (3) "any member of a class of plaintiffs is a citizen of a State different from any defendant."

1    28 U.S.C. § 1332(d).  CAFA allows the aggregation of individual class members' claims

2    to determine whether the amount in controversy exceeds $5,000,000.  Id. § 1332(d)(6).

3    "Under CAFA, the burden of establishing removal jurisdiction remains, as before, on the

4    proponent of federal jurisdiction."  Abrego Abrego v. Dow Chem. Co., 443 F.3d 676, 685

5    (9th Cir. 2006).

6         The Jurisdiction and Venue allegations in Plaintiff's Complaint state:

7              "[T]he amount in controversy for each class representative,
8              including claims for monetary damages, restitution, penalties,
               injunctive relief, and a pro rata share of attorneys' fees, is
9              less than seventy-five thousand dollars ($75,000) and that
               the aggregate amount in controversy for the proposed class
10             action, including monetary damages, restitution, penalties,
               injunctive relief, and attorneys' fees, is less than five million
11             dollars ($5,000,000), exclusive of interest and costs. Plaintiff
               reserves the right to seek a larger amount based upon new
12             and different information resulting from investigation and
               discovery."

13   (ECF No. 1-3 at 3.)  Plaintiff's Prayer for Relief requests "damages, restitution penalties,

14   injunctive relief, and attorneys' fees in excess of twenty-five thousand dollars ($25,000)

15   but not to exceed five million dollars ($5,000,000)."  (Id. at 26.)

16

17   **A.    Defendants' Burden**

18

19        Plaintiff contends that the Court lacks CAFA jurisdiction because Plaintiff pled an

20   amount in controversy less than the $5,000,000 requirement for federal jurisdiction

21   under CAFA, and Defendants failed to prove with legal certainty that the CAFA

22   requirement was met.  (ECF No. 5 at 10-12.)  When a plaintiff pleads an amount in

23   controversy less than CAFA's $5,000,000 requirement, the removing defendant "must

24   prove with legal certainty that CAFA's jurisdictional amount is met."  Lowdermilk v. U.S

25   Bank Nat'l Ass'n, 479 F.3d 994, 999 (9th Cir. 2007).  The plaintiff must plead the amount

26   in "good faith" for the legal certainty standard to apply.  Id.

27   ///

28   ///

1    However, "[w]here the complaint does not specify the amount of damages sought, the

2    removing defendant must prove by a preponderance of the evidence that the amount in

3    controversy requirement has been met." Abrego Abrego, 443 F.3d at 683.  That is, a

4    preponderance of the evidence is the appropriate standard "where it is unclear or

5    ambiguous from the face of a state-court complaint whether the requisite amount in

6    controversy is pled." Guglielmino v. McKee Foods Corp., 506 F.3d 696, 699 (9th Cir.

7    2007).

8          Defendants contend Plaintiff pled the amount in controversy in bad faith for two

9    reasons.  First, Defendants take issue with Plaintiff's "boiler plate strategy" in alleging

10   that the total amount in controversy is less than $5,000,000.  Second, Defendants argue

11   that Plaintiff's reservation of right to seek larger damages based on new information also

12   evidences Plaintiff's bad faith.  Thus, Defendants conclude, the preponderance standard

13   should govern their burden.  (ECF No. 7 at 9-11.)

14         To support these assertions, Defendants rely almost exclusively on Butterworth v.

15   American Eagle Outfitters, Inc., No. 1:11-cv-01203 LJO DLB, 2011 WL 4905641 (E.D.

16   Cal. Oct. 14, 2011), aff'd 2011 WL 5825700 (E.D. Cal. Nov. 17, 2011).  In Butterworth, a

17   plaintiff representing 14,314 individuals alleged the amount in controversy was less than

18   $5,000,000.  The magistrate judge found bad faith because the plaintiff "made no effort

19   to support his allegations" and "rest[ed] on his desire to be in state court." Id. at *3.

20         Defendants' reliance on Butterworth is misplaced for several reasons.  First,

21   Butterworth is easily distinguishable from this case.  The Butterworth Plaintiff's

22   Jurisdiction and Venue section made clear that the amount in controversy was less than

23   $5,000,000 excluding interest and costs, but the Prayer for Relief section provided that

24   the amount in controversy was less than $5,000,000, excluding "*attorneys' fees*,

25   interests and costs."  2011 WL 5825700, at *7 n.1.  The District Court noted that "it is

26   well-settled that attorneys' fees is include[ed] in the amount in controversy calculation for

27   CAFA purposes." Id. (citing Guglielmino v. McKee Foods Corp., 506 F.3d at 699-700).

28   ///

1    Second, while the district court affirmed the magistrate judge's ruling, the court did

2    so without affirming the Magistrate Judge's finding of bad faith.  See Butterworth, 2011

3    WL 5825700, at *7 n.3.  Instead, the court stated: "Because this Court affirms the

4    magistrate judge's ruling based on the legal certainty standard, it does not reach

5    [Plaintiff's] arguments related to the magistrate judge's good faith determination."  Id.

6    Third, the magistrate judge in Butterworth ignored controlling Ninth Circuit

7    precedent on the issue.  With regard to Ninth Circuit precedent, Lowdermilk concluded

8    that pleading damages of less than $5,000,000 was sufficiently specific and did not

9    amount to bad faith.

> [A] plaintiff may sue for less than the amount she may be
> entitled to if she wishes to avoid federal jurisdiction and
> remain in state court.  Where the plaintiff has alleged her
> facts and pled her damages, and there is no evidence of bad
> faith, the defendant must not only contradict the plaintiff's
> own assessment of damages, but must overcome the
> presumption against federal jurisdiction.

14   479 F.3d at 999 (internal citations and quotations omitted).  The Ninth Circuit then

15   placed the burden on the defendants to show federal jurisdiction should apply, using the

16   legal certainty standard.  Id. at 998-99.  Therefore, Defendants' argument that the "boiler

17   plate strategy" of pleading damages of less than $5,000,000 to avoid CAFA jurisdiction

18   amounts to bad faith fails in light of Lowdermilk.

19   Finally, as set forth above, multiple decisions, including the Velasquez decision of

20   this Court, reject the argument that "reservation of rights" language implies a lack of

21   good faith.  See Velasquez v. HMS Host USA, Inc., No. 2:12-cv-02313-MCE-CKD, 2012

22   WL 6049608 (E.D. Cal. Dec. 5, 2012); Jones v. ADT Security Services, Inc.,

23   No. CV 11-7750 PSG (JCGx), 2012 WL 12744 (C.D. Cal. Jan. 3, 2012).

24   ///

25   ///

26   ///

27   ///

28   ///

1   In <u>Jones</u>, the Central District of California stated that:

> the 'reservation of rights' language used by the Plaintiffs states nothing more than what Plaintiffs would already have the right to do.  If Plaintiffs find 'based upon new and different information resulting from investigation and discovery that their potential recovery is larger, then they could seek to amend their Complaint.  In other words, the 'reservation of rights' does not add anything material to the Complaint, and, thus, cannot create an ambiguity as to the amount of damages Plaintiffs are seeking at this time.

2012 WL 12744, at *2.  In <u>Velasquez</u>, this Court agreed with the reasoning of <u>Jones</u> and held that "[b]ecause Plaintiff has specifically alleged that her case does not meet the diversity jurisdiction threshold required for CAFA jurisdiction, Defendants must establish with legal certainty that the amount in controversy exceeds the statutory minimum." 2012 WL 6049608, at *7, *10.

  In this case, as in <u>Jones</u> and <u>Velasquez</u>, Plaintiff's reservation or right does not create an uncertainty about the amount in controversy; it does no more than state a right that Plaintiff already possesses.  Stating a right already possessed cannot amount to bad faith.  Moreover, Defendants bear the burden of showing bad faith on the part of Plaintiff.  Defendants have not identified any cases – other than the magistrate judge's findings in <u>Butterworth</u> – that found bad faith on similar facts, nor have Defendants pointed to facts that would warrant a finding of bad faith in this case.  The Court finds Plaintiff's allegations regarding the amount in controversy do not amount to bad faith.  Accordingly, the legal certainty standard applies.

### B.    Amount in Controversy

  The legal certainty standard "sets a high bar for the party seeking removal, but it is not insurmountable."  <u>Lowdermilk</u>, 479 F.3d at 1000.  However, Defendant needs to produce enough "concrete evidence" to allow the court to "estimate with any certainty the actual amount in controversy."  <u>Id.</u> at 1001.

///

9

1           **1.**    **Overtime and Minimum Wage Violations**

2

3       Plaintiff's first and second causes of action allege class members "regularly"

4 worked off-the-clock hours "in excess of eight hours in a day, in excess of twelve hours

5 in a day, and/or in excess of forty hours in a week" without receiving overtime or

6 minimum wages.  (ECF No. 1-3 at 13.)  Defendants assert the amount in controversy for

7 these claims is $7,637,180.  (ECF No. 7 at 17.)  Defendants reach that figure by

8 assuming the claims must be for more than ten minutes a day because they assert

9 anything less would be <u>de minimis</u>.  (Id. at 15.)  Defendants then assume that the

10 alleged violations happened at least twice a week, totaling twenty hours per week for

11 each groomer.  Next, Defendants multiply the number of workweeks in question

12 (146,488) by the average wage per hour ($9.62) for twenty minutes to get $469,609.87

13 in unpaid wages.  Defendants then conclude that because groomers "often" worked

14 eight-hour shirts, the alleged violations likely were overtime, adding $234,804.94 in

15 unpaid overtime to the amount in controversy for this claim.  Finally, Defendants contend

16 that because the violations happened "regularly," that necessarily means the alleged

17 violations occurred every workweek.  Defendants multiply the number of weeks (fifty-

18 two) by the number of groomers employed in the year prior to the filing of this suit

19 (1,233) by the PAGA penalties for each minimum and overtime wage violations ($50 for

20 the first violation and $100 for subsequent violations) to arrive at $6,288,350 in PAGA

21 penalties.  Defendants also add liquidated damages for unpaid minimum wages for a

22 total of $7,637,180 in controversy with regard to the minimum and overtime wage claims.

23       Defendants' argument relies on the assumption that the alleged violations must

24 be more than ten minutes a day.  Defendants cite <u>Lindow v. United</u>, 738 F.2d 1057,

25 1062 (9th Cir. 1984) ("Most courts have found daily periods of approximately 10 minutes

26 <u>de minimis</u> even though otherwise compensable."), and <u>Rutti v. Lojack</u>, 596 F.3d 1046,

27 1058-59 (9th Cir. 2010), for their <u>de minimis</u> proposition.  (ECF No. 7 at 10.)  However,

28 Defendants mischaracterize those two decisions.

1   Lindow found "[t]here is no precise amount of time that may be denied compensation as

2   de minimis.  No rigid rule can be applied with mathematical certainty."  738 F.2d at 1062

3   (emphasis added).  Indeed, Lindlow noted that "[c]ourts have granted relief for claims

4   that might have been minimal on a daily basis but, when aggregated, amounted to a

5   substantial claim."  Id. at 1063.  To determine what amount of "otherwise compensable

6   time [was] de minimis," Lindow created a three-part test that examined "(1) the practical

7   administrative difficulty of recording the additional time; (2) the aggregate amount of

8   compensable time; and (3) the regularity of the additional work."  Id.  In Rutti, the Ninth

9   Circuit explicitly stated "we have not adopted a ten or fifteen minute de minimis rule."

10   596 F.3d at 1058.  In sum, because the aggregate amount of compensable time figures

11   into the determination, it is possible to find that uncompensated time less than ten

12   minutes is not de minimis.

13        Defendants use the ten-minute standard to build their entire computation, but

14   Lindow and Rutti are clear that the de minimis standard is not a "mathematical certainty."

15   Moreover, Defendant's "calculations require the Court to make assumptions that lack

16   evidentiary support."  Vigil v. HMS Host USA, Inc., No. C 12-02982 SI, 2012 WL

17   3283400, *5 (N.D. Cal. Aug. 10, 2012).  As in Vigil, "Defendants do not cite to any

18   evidence for [their] assumptio[n] that each alleged violation" was more than ten minutes

19   per day, or that the violations occurred every work week.  Id.  Defendants rely on

20   semantics, rather than facts, to ascertain the amount in controversy for these claims.

21   Therefore, Defendants' "calculations call for too much extrapolation and speculation for

22   the court to determine damages to a legal certainty."  Id.  As such, this amount cannot be

23   used in calculating whether Plaintiff's damages reach the jurisdiction threshold of

24   $5,000,000.

25   ///

26   ///

27   ///

28   ///

1

**2.    "Waiting Time" Penalties**

2

3        Plaintiff's third claim alleges Defendants failed to pay putative class members

4   their earned wages in a timely manner upon their termination.  Those unpaid wages

5   include overtime wages, minimum wages, missed meal and rest period premiums,

6   reporting time pay and vested vacation wages.  (ECF No. 1-3 at 15.)  California Labor

7   Code sections 201 and 202 mandate an employer pay an employee all wages owed at

8   the time of discharge or within seventy-two hours of termination.  If employers do not

9   comply with these provisions, the employee's wages continue as a penalty from the due

10  date until paid, but no longer than thirty days.  Cal. Lab. Code § 203.

11       Defendants assume that because Plaintiff alleges Defendants never paid for off-

12  the-clock work and putative class members "regularly" worked off the clock, Defendants

13  allegedly owe every groomer terminated during the applicable time period "waiting time"

14  penalties for the full thirty days.  Defendants calculate the number of groomers

15  terminated during the applicable time period (537) multiplied by the average shift length

16  for groomers (seven hours) multiplied by the average groomer wage ($9.62 an hour)

17  multiplied by thirty days equals at least $1,084,847.40 in controversy for this claim.

18  (ECF No. 7 at 18.)  Alternatively, Defendants argue that because 90% of the 537

19  groomers accrued vacation time, those 484 groomers allegedly were entitled to waiting

20  time claims for vested vacation time, equaling $977,776.80 in damages.  Defendants

21  additionally conclude that PAGA penalties would apply in the amount of $375,900,

22  bringing the minimum amount in controversy for this claim to $1,353,677.  (Id. at 19.)

23       The problems discussed above resurface with Defendants' calculations regarding

24  the "waiting time" penalties.  Defendants do not provide the necessary concrete

25  evidence as to why the maximum penalty should apply to each class member.  See

26  Velasquez, 2012 WL 6049608, at *8 (noting Defendants cannot assume the maximum

27  penalty when Plaintiffs did not allege it); Vigil, 2012 WL 3283400, at *6.

28  ///

1    Furthermore, Defendants' assumption that the 537 groomers worked an average of

2    seven hours a day lacks support, as well. "By merely assuming the maximum aggregate

3    penalty and average hours worked, defendants do not carry [their] heavy burden of

4    proving damages with legal certainty." Vigil, 2012 WL 3283400, at *6. Therefore,

5    Defendants have failed to show this amount in controversy with legal certainty and

6    cannot use this amount to calculate whether Plaintiff's damages reach the jurisdiction

7    threshold of $5,000,000.

8

9                    **3.    Missed Meal and Rest Break Claims**

10

11          Plaintiff's fourth and fifth claims allege that Defendants required groomers to work

12   through meal and rest periods without proper compensation for "all" the missed breaks in

13   violation of California Labor Code sections 226.7 and 512(a).  (ECF No. 1-3 at 17-18.)

14   Relying on Campbell v. Vitran Express, Inc., 471 F. App'x 646, 648 (9th Cir. 2012),

15   Defendants contend these assumed violations, coupled with one PAGA penalty per

16   week for the year preceding the lawsuit, equal $14,928,486 in controversy.  (ECF No. 7

17   at 20.)

18          However, Defendants' reliance on Campbell is misguided.  Plaintiffs in that case

19   "tacitly admitted that they [would] seek more than $5 million at trial, and refused to

20   stipulate to a lower amount at oral argument."  471 F. App'x at 647.  Moreover, the

21   plaintiffs' prayer for relief in Campbell "state[d] no limit on the relief sought, and instead

22   [sought] all actual, consequential, and incidental losses."  Id. at 649.  The Ninth Circuit

23   noted that "[w]hile Lowdermilk clearly supports the proposition that a party 'may sue for

24   less than' $5 million and may 'forgo a potentially larger recover[y] to remain in state

25   court,'" there is "nothing in Lowdermilk that supports the proposition that a party may

26   avoid federal court by pleading that he is seeking less than $5 million in the complaint,

27   but refusing to support that pleading with any sort of judicially binding admission . . . ."

28   Id. at 647 (citing 479 F.3d at 999).

                                            13

1    Finally, the complaint in <u>Campell</u> alleged the defendant "regularly and consistently" failed

2    to provide proper meal and rest periods, and the class representatives testified that they

3    "were <u>never</u> allowed to take meal or rest breaks," that "all the other employees they

4    knew complained about not getting to take <u>any</u> meal or rest breaks," and that "no

5    employees statewide (which is the entire class) were allowed to take meal or rest

6    breaks."  <u>Id.</u> (quotations omitted) (emphasis added).

7         There is no such evidence before the Court in this case.  Plaintiffs only allege that

8    Defendants did not compensate groomers for "all" missed breaks.  Defendants'

9    conclusion that every groomer missed at least one meal period a week yet again

10   amounts to mere speculation and conjecture.  <u>See</u> <u>Lowdermilk</u>, 479 F.3d at 1002.

11   Therefore, Defendants have failed to show this amount in controversy with legal certainty

12   and cannot use this amount to calculate whether Plaintiff's damages reach the

13   jurisdiction threshold of $5,000,000.

14

15              **4.    Non-Compliant Wage Statements**

16

17        Plaintiff's sixth claim alleges Defendants did not provide complete and accurate

18   wage statements in violation of California Labor Code section 226(a).  (ECF No. 1-3 at

19   19).  Plaintiff seeks penalties of up to $4,000 per employee.  Defendants contend that

20   because Plaintiff alleges that she and putative class members "regularly" worked off the

21   clock, Plaintiff must have worked off the clock at least ten minutes daily, and thus

22   Plaintiff must have had noncompliant wage statements occurring every pay period.

23   Defendants conclude the penalties for wage statement violations would be $4,932,000.

24   (ECF No. 7 at 17.)  Defendants reach this number by calculating that there were at least

25   1,233 groomers employed in the year preceding the filing of the lawsuit (the statute of

26   limitations period for this claim), and each is entitled to $4000 at minimum.  Thus, 1,233

27   groomers x $4000 = $4,932,000.

28   ///

1    Defendants' calculations are problematic because they refer back to Defendant's

2  arguments regarding de minimis off-the-clock work, which the Court rejects.  See supra.

3  As set forth above, the Ninth Circuit has not adopted a ten-minute de minimis rule.  Rutti,

4  596 F.3d at 1058.  Therefore, Defendants merely speculate that every wage statement

5  did not comply with section 226(a), and that each class member received an improper

6  wage statement.  Again, Defendants' calculations regarding the regularity of the alleged

7  violations and what constitutes de minimis overtime work are speculative.  As such,

8  Defendants have failed to show this amount in controversy with legal certainty, and the

9  Court cannot properly include this amount to calculate whether Plaintiff's damages reach

10  the jurisdiction threshold of $5,000,000.

11

12                    **5.    Unpaid Business Expenses**

13

14    Plaintiff's seventh claim alleges Defendants failed to reimburse groomers for

15  necessary expenditures, including purchases and maintenance of scissors, shears,

16  clippers and clipper blades, in violation of California Labor sections 2800 and 2802.

17  (ECF No. 1-3 at 20.)  Defendants, using the average cost of the tool kit their groomers

18  used ($627), and assuming that the 1,556 groomers employed by Defendant during the

19  statute of limitations period each needed one set of tools at this cost, concluded the

20  amount in controversy is $821,708.04 for the cost of tools.  In addition, Defendants

21  conclude that 1,556 groomers spent $356 annually to maintain their tools during the past

22  three years, putting another $553,936 in controversy.  Thus, according to Defendants,

23  the total amount in controversy is $1,375,644 for this claim.  (ECF No. 7 at 21.)

24    Defendants' calculations rely on assumptions that every groomer was not

25  reimbursed for her tool kit and for all of her maintenance fees.  As with Plaintiff's

26  previous claims, Defendants' calculations rely on assumptions about every member of

27  the class, which simply enjoys no support from the complaint or from any other evidence

28  in this case.

1    Plaintiff does not allege that Defendant failed to reimburse every class member.

2    Defendants merely speculate that this is the case.  Therefore, Defendants have failed to

3    show this amount in controversy with legal certainty, and the Court cannot use this

4    amount to calculate whether Plaintiff's damages reach the jurisdiction threshold of

5    $5,000,000.

6

7                    **6.      PAGA Penalties**

8

9          Plaintiff's eighth cause of action seeks to recover penalties under PAGA, Cal.

10   Lab. Code § 2698, et seq.  PAGA penalties are $100 for each initial violation and $200

11   for each subsequent violation.  Cal. Lab. Code § 2699(f)(2).  Defendants employed

12   approximately 1,233 employees during the period covered by PAGA.  Defendant

13   assumes that there was one PAGA violation per employee.  Thus, Defendant calculated

14   the PAGA penalties as follows: $100 penalty x 1,233 employees = $123,300.

15         However, with regard to the PAGA penalties, Defendants put forth no evidence in

16   support of their assertion that each putative class member is entitled to PAGA penalties.[4]

17   Therefore, Defendants have failed to show this amount in controversy with legal certainty

18   and cannot use this amount to reach the $5,000,000 jurisdictional threshold either.  See

19   Velasquez, 2012 WL 6049608, at *9 (declining to count PAGA penalties toward the

20   amount in controversy where the defendants did not offer "evidence to support their

21   assertion that each putative class member is entitled to maximum penalties under

22   PAGA").

23   ///

24   ///

25   ///

26         [4] Plaintiff also asserts that this Court only should consider twenty-five percent of the PAGA penalty
27   calculation to determine the amount in controversy.  (ECF No. 5 at 18; ECF No. 13 at 18.)  Because
     Defendants have failed to demonstrate the PAGA penalties with legal certainty, the Court declines to
28   reach the issue of whether the whole amount or only twenty-five percent of the PAGA penalty should count
     toward the amount-in-controversy requirement.

1

**CONCLUSION**

2

3          In sum, Defendants failed to prove to a legal certainty that the amount in

4   controversy exceeds $5,000,000.  As a result, CAFA does not provide a proper basis for

5   subject matter jurisdiction.  As such, there is no federal subject matter jurisdiction in this

6   case.  Consequently, Plaintiff's Motion to Remand is GRANTED.  The case is hereby

7   remanded to the Superior Court of the State of California, County of Shasta, and the

8   Clerk of the Court is directed to close the case.

9          IT IS SO ORDERED.

10  Dated:     March 6, 2013

11

12

13                                   MORRISON C. ENGLAND, JR., CHIEF JUDGE
                                     UNITED STATES DISTRICT JUDGE
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17